# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Crim. No. CR-10-190 JNE/SRN |
| Plaintiff, | |
| v. | **REPORT & RECOMMENDATION** |
| Sherita Scott-Kelley (01);<br>Monica Williams (02); and<br>Ronald Bila Shaka (03), | |
| Defendants | |

---

Leshia Lee-Dixon, United States Attorney's Office, St. Paul Division, 316 North Robert Street, 404 Federal Building, St. Paul, Minnesota 55105, for Plaintiff United States of America

Robert J. Kolstad, 2249 East 38th Street, Suite 8, Minneapolis, Minnesota 55407, for Defendant Scott-Kelley (01)

Douglas Olson, Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, Minnesota 55415, for Defendant Williams (02)

Paul Daniel Schneck, 701 Fourth Avenue South, Suite 500, Minneapolis, Minnesota 55415, for Defendant Shaka (03)
_____

SUSAN RICHARD NELSON, United States Magistrate Judge

The above entitled matter came before the undersigned United States Magistrate Judge on the following motions of Defendant Sherita Scott-Kelley: Motion to Suppress Evidence Obtained as a Result of Any Illegal Searches or Seizures (Doc. No. 46); Motion to Suppress All Evidence Obtained as a Result of Any Violation of Her Rights as Secured by the Fifth Amendment (Doc. No. 47); and Motion to Suppress All Electronic Surveillance (Doc. No. 48).

The following motions of Defendant Monica Williams are also before the Court: Motion

1

to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 66) and Motion to Suppress Statements, Admissions and Answers (Doc. No. 67).

Finally, the following motions of Defendant Ronald Bila Shaka are also before the Court: Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 74); Motion to Suppress Statements (Doc. No. 75); and Motion to Suppress Eyewitness Identification (Doc. No. 76).

The Government did not file any pretrial motions. This case has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.

## I.    FACTUAL BACKGROUND

All three Defendants are charged with conspiracy to commit identity theft, aggravated identity theft and bank fraud. In addition, Defendants Scott-Kelley and Williams are charged with access device fraud. (See Indictment, Doc. No. 1.) Defendants Scott-Kelley and Shaka are a married couple and Defendants Scott-Kelley and Williams are former co-workers.

Testifying at the criminal motions hearing was Postal Inspector Troy Sabby. The Government submitted seven exhibits:

    1.    Govt. Ex. 2: CD Recording of October 2008 Interviews of Defendants Scott-Kelley and Williams

    2.    Govt. Ex. 2A: Transcript of October 9, 2008 Interview of Defendant Williams

    3.    Govt. Ex. 3: Application, Search Warrant and Return for Maryland Street Residence

    4.    Govt. Ex. 4: Application, Search Warrant and Return for Baker Street Residence

5.      Govt. Ex. 5: Application, Search Warrant and Return for Queen Avenue Residence

6.      Govt. Ex. 6: Application, Search Warrant and Return for Brooklyn Center Residence

**A.      Inspector Sabby's Testimony**

Postal Inspector Sabby testified that in October 2008, he was assigned to investigate a case involving Defendant Williams. As a postal inspector, Inspector Sabby stated that he investigates crimes involving the United States mail, often in partnership with local law enforcement agencies. He testified that the investigation involving Ms. Williams involved financial crime investigative agencies as well as Ramsey County law enforcement authorities.

During the investigation, Inspector Sabby testified that he was present during an interview of Defendant Williams on October 9, 2008 in her Brooklyn Center, Minnesota apartment, during the execution of a search warrant. Also present during the interview were Ramsey County Sheriff's Office Investigator Julie Urban and Minneapolis Police Department Sergeant and Member of the Minnesota Financial Crimes Task Force, Charles Nathan. Inspector Sabby testified that although they were armed, the officers did not un-holster their weapons at any time during the interview. The interview, which was recorded (see Williams' Interview CD, Govt. Ex. 2), lasted approximately 25 minutes. Ms. Williams was not under arrest before the interview, nor was she arrested immediately afterwards. Inspector Sabby testified that he had no concerns about Ms. Williams' ability to understand the questions and that before any questions were asked, Investigator Urban read Williams her Miranda rights, which she waived. Inspector Sabby described Ms. Williams' demeanor as polite, although she appeared to be understandably a little upset.

**B.     Queen Avenue Search Warrant (Govt. Ex. 5)**

In the application for the Queen Avenue search warrant, Sergeant Charles Nathan, the affiant, attests that in September 2008, a Confidential Informant ("CI") contacted him with information that Defendant Scott-Kelley, Defendant Shaka and another person, identified here as R.S., all residing at a specified Queen Avenue address in Minneapolis, were engaged in identity theft, forgery, check counterfeiting and theft.  The CI indicated that Defendant Scott-Kelley, a home health care worker employed at a health care facility located on Park Avenue South in Minneapolis, was stealing personal information, bank information and checkbooks from both clients and the facility itself.  (See Queen Ave. Search Warrant Aff. at 1-2; Govt. Ex. 5.)  The CI further stated that Defendant Scott-Kelley passed along this account information to R.S., who used it to order merchandise online and ship the merchandise to third-party addresses.  (Id.)  The CI stated that Defendant Scott-Kelley had "cleaned out" a home health care client's bank account in the amount of approximately $50,000.  The client's initials were either P.T. or P. W., and he also lived on the same block of Queen Avenue as Defendants Scott-Kelley and Shaka.  In addition, the CI indicated that Defendant Shaka and R.S. had purchased a Cadillac and another type of passenger car with some of the proceeds of their alleged activities.

Further, the CI stated that she was present during the delivery of a package to an address in St. Paul, when shortly thereafter, R.S. telephoned that address to see if the package had arrived.  In addition, the CI provided an address of 29xx Fourth Street in Minneapolis, which she believed Defendant Scott-Kelley and R.S. used to receive fraudulently obtained merchandise.

In addition to the information from the CI, Sergeant Nathan attests that he drove to the Queen Avenue property and observed a van parked in front of the house and a newer car parked

4

in the driveway.  The car was registered to Defendant Scott-Kelley and the other car was

registered to R.S.  Sergeant Nathan also searched the property tax records to learn that Defendant

Shaka was listed as the homeowner-taxpayer for the Queen Avenue residence.  (Id.)

Also in September 2008, Sergeant Nathan states that he was assigned two cases from the

Minneapolis Police Department's Forgery Fraud Unit.  One case, reported by an employee of

Merrill Lynch, involved a suspect who had opened an account bearing the name M.A.M, along

with a social security number, both of which belonged to an identity theft victim from Missouri.

(Id.)  The reported suspect also had presented two checks totaling $115,000, drawn on an

account listing P.T. as the holder, with a Queen Avenue address identical to that provided by the

CI with respect to the alleged victim P.T. or P.W.  The reporting Merrill Lynch employee

indicated that P.T. is a resident of the Oak Grove Care Center, located on Park Avenue South in

Minneapolis, and that neither P.T., nor the trustee of P.T.'s account had authorized or written the

checks in question.[1]  The suspect in the Merrill Lynch incident had provided a phone number on

the Merrill Lynch account application.  (Id.)  This number was listed to Defendant Williams

"who worked with Scott-Kelley at the Oak Grove Care Center when problems started to occur."

(Id.)

The affidavit further provides that the second fraud case assigned to Sergeant Nathan was

a report from W.T., the trustee of P.T's account, discussed above.  W.T. reported that four forged

checks and several unauthorized electronic withdrawals were made from P.T.'s account.  W.T.

verified that P.T. was a resident at Oak Grove Care Center and that "the Oak Grove Care

---

[1]  The search warrant affidavits in this case interchangeably refer to the "Oak Grove Care Center" and the "Oak Grove Care Facility," which the court construes as the same entity.  For the sake of consistency, the Court refers to the facility as the "Oak Grove Care Center."

[Center] believes that several past employees are responsible for the loss from the account."

(Id.)

Sergeant Nathan attests that his investigation further revealed six other Minneapolis Police Department reports involving the Oak Grove Care Center in which Defendant Scott-Kelley was identified as the suspect. (Id.) For instance, Sergeant Nathan learned that on June 6, 2008, Sarah Williams, who owns both the Oak Grove Care Center and Mosaic Apartment Services, filed a theft report on behalf of Oak Grove Care Center reporting that three checks bearing the numbers 6505, 6506 and 6507 were removed from the facility's checkbook. Sarah Williams reported that a US Bank location at 919 East Lake Street called her to report that a person had presented one of the stolen Oak Grove Care Center checks in the amount of $3000. The suspects listed on the report filed in connection with the stolen checks were Defendant Monica Williams and Defendant Scott-Kelley. (Id.)

Sergeant Nathan also avers that on June 30, 2008, Sarah Williams filed an identity fraud report with the Minneapolis Police Department. According to the report, when her business phones were not working, Sarah Williams contacted her provider, Qwest. Qwest advised Sarah Williams that a person claiming to be her had contacted them and changed the number. Also, Sergeant Nathan describes a September 9, 2008 Minneapolis Police Department report by Oak Grove Care Center/ Mosaic Apartment Services business manager Jody Linder that a past client had attempted to deposit a counterfeit Mosaic Apartment Services check. The counterfeit check listed an inaccurate address for Mosaic Apartment Services on 29xx Fourth Street North in Minneapolis, which, Sergeant Nathan states, was the same address that his CI provided as a possible drop ship address used by Defendant Scott-Kelley and R.S. for stolen merchandise. (Id.

6

at 2-3)

Sergeant Nathan also attests that he learned that Ramsey County Sheriff's Department Investigator Julie Urban and Postal Inspector Troy Sabby were investigating Scott-Kelley for similar crimes involving victims Sarah Williams, the Oak Grove Care Center and Mosaic Apartment Services. Inspector Sabby informed Sergeant Nathan of a St. Paul Police Department report regarding an incident in which a vulnerable adult attempted to cash one of the Oak Grove Care Center checks reported as stolen, in the amount of $5,266.33, at a US Bank location on Grand Avenue in St. Paul. When St. Paul Police questioned the vulnerable adult, she stated that Defendant Scott-Kelley brought her to the bank to cash the check and offered to buy her a car with the proceeds. (Id.)

Through Inspector Sabby, Sergeant Nathan states that Sarah Williams had also reported a falsely submitted change of address form on July 7, 2008 for Oak Grove Care Center, changing the facility's Minneapolis address from Park Avenue South to 29xx Fourth Street North. Also on July 7, 2008, Jody Linder, Oak Grove Care Center's business manager, advised Sarah Williams that several clients' checks had not arrived in the mail. Sergeant Nathan states that Sarah Williams contacted Hennepin County's Adult Protective Services because the clients' checks had "been forwarded to a bad address." (Id.)

Sergeant Nathan attests that Inspector Sabby informed him that he and Investigator Urban went to the 29xx Fourth Street North address and found a note on the mail box directing the delivery of mail to a house across the street. Sergeant Nathan also states that Investigator Urban informed him that Sarah Williams reported that on July 19, 2008, she received a credit watch alert, indicating that on July 18, 2008, an unauthorized application had been made for a

Bank of America account in the name of Sarah Williams, with an address of 29xx Fourth Street North.

Sergeant Nathan attests that he received a call from his CI on September 22, 2008, stating that she had learned that Defendant Scott-Kelley also owned property in St. Paul, but did not know the address. The CI also reported that Defendants Scott-Kelly and Shaka were talking about buying a home with their money, and that Scott-Kelley continued to work as a home health care worker, stealing clients' money. (Id.)

Sergeant Nathan further states that on September 29, 2008, he received an Office Depot proof of delivery form from Investigator Urban. Investigator Urban advised Sergeant Nathan that Sarah Williams received the proof of delivery for merchandise that she did not order and she provided the form to Investigator Urban. The items ordered were an HP Slimline S3521P computer and a Compaq C771US notebook computer, which had been billed to an Oak Grove Care Center credit card without Sarah Williams' consent. (Id.) The computers were shipped to 29xx Fourth Street North and the bill was sent to Oak Grove Care Center on Park Avenue South in Minneapolis. (Id.)

At the conclusion of the search warrant affidavit, Sergeant Nathan seeks unannounced entry for the execution of the warrant because the CI had informed him that Defendant Scott-Kelley had possessed guns in the past and Scott-Kelley told the CI that she currently has a gun. The CI also informed Sergeant Nathan that Defendant Shaka kept a gun at the Queen Avenue home and had been imprisoned on gun-related charges. Sergeant Nathan reviewed Defendant Shaka's criminal history and found that he was convicted and sentenced for weapon violations. (Id.)

The search warrant, signed by Hennepin County District Court Judge Patricia Belois, authorized the search of the Queen Avenue north residence for the following items:

(1) computer-related items including HP Slimline S3521P and Compaq C771US computers; computers; computer hardware consisting of all equipment which can collect, create, display, convert and store data; hardware including, but not limited to, any data-processing devices (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, digital cameras; optical storage devices; transistor-like binary devices, and other memory-storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors and optical readers), as well as any devices, mechanisms or parts that can be used to restrict access to computer hardware (such as physical keys and locks);

(2) computer software used for the printing of checks;

(3) shipping receipts (including UPS, Fed Ex and others), bank statements, receipts indicating purchases made by credit card or check;

(4) cellular telephones;

(5) papers or other documents containing the names or account numbers of persons or businesses;

(6) papers or other documents containing names or other information about persons not residing at this address; paper and items showing constructive possession of the residence being searched; and

(7) safety deposit keys, records and other documents tending to show off-site storage facilities and/or locations.

(Queen Avenue Search Warrant at 2-1, Govt. Ex. 5.) In addition, the warrant requested permission "to have any computer(s) recovered during the search to be brought to a qualified computer forensic analyst to recover any evidence stored within the computer(s) germane to [the] current investigation." (Id.)

The warrant was signed by Judge Belois on October 6, 2008 and the search was executed

on October 8, 2008. (<u>See</u> Return for Queen Avenue, Govt. Ex. 5.) Among the electronic items seized were the following: an HP Slimline S3521P computer; an HP office jet printer and HP color monitor; various HP manuals; a Dell computer with attached electronic media device; an HP digital camera; an HP printer; a Sony digital handicam video camera, digital video cassettes, five cell phones; an MP3 player; a Performance Teknique in-dash monitor; a JVC subwoofer speaker; a Pyle View LCE monitor; a Solo Baric subwoofer; and a Kicker subwoofer speaker. (<u>Id.</u>)

Law enforcement officers also seized various documentary items including miscellaneous papers, shredded documents and credit cards; letters addressed to various persons, miscellaneous receipts; credit cards in Defendant Shaka's name; a box of TCF checks in the name of Defendant Scott-Kelley; boxes of TCF checks in the names of two other persons; a folder containing Scott-Kelley's work-related documents; miscellaneous credit cards and Scott-Kelley's Minnesota driver's license; and a checkbook for a Wells Fargo account in Scott-Kelly's name. (<u>Id.</u>)

In addition, officers seized a Mossberg twelve-gauge shotgun and shells and a night vision scope, along with various tools including a cut-out saw with receipt, a chainsaw with sales ticket, two Craftsman 106-piece mechanics' tool sets, a Craftsman three-drawer tool box and a power tool set. Also seized were certain jewelry items, including a men's Movado watch with receipt, a gold bar and a gold and diamond bracelet with appraisal letter. Finally, officers seized five pairs of shoes. (<u>Id.</u>)

## C. Brooklyn Center Search Warrant (Govt. Ex. 6)

Sergeant Nathan also provided the affidavit in support of the search of Defendant Williams' 69th Avenue North apartment in Brooklyn Center, Minnesota. In this affidavit,

Sergeant Nathan attests that on October 8, 2008, he executed search warrants at Queen Avenue and Fourth Street North in Minneapolis. (Brooklyn Center Search Warrant Aff. at 1-2, Govt. Ex. 6.) He states that Defendants Scott-Kelley, Williams and Shaka are suspects in identity theft, forgery and mail theft investigations. In addition, Sergeant Nathan notes that Scott-Kelley and Williams are former coworkers at the Oak Grove Care Center, which provides care to elderly and vulnerable adults. He indicates that Sarah Williams, owner of the Oak Grove Care Center, made seven Minneapolis Police reports listing former employees Williams and Scott-Kelley as suspects. (Id.) Sergeant Nathan describes the police reports involving the HP and Compaq computers purchased from Office Depot and delivered to 29xx Fourth Street North, which matched other unauthorized deliveries of mail to the same address. In addition, Sergeant Nathan refers to the report involving missing checks from Oak Grove Care Center residents and the information from Investigator Urban and Inspector Sabby regarding the note attached to the mail box at 29xx Fourth Street North directing the delivery of mail across the street. (Id.)

Sergeant Nathan indicates that during his execution of the Queen Avenue search warrant, the HP computer was seized, along with various other items. Sergeant Nathan attests that in a Mirandized interview conducted during the execution of the search warrant, Defendant Scott-Kelley stated that she received stolen credit card and account information from her former co-worker, Defendant Williams. Scott-Kelley also identified herself and Defendant Williams in visual images at ATMs making deposits and withdrawals with stolen account information. Sergeant Nathan reports that in her statement, Defendant Scott-Kelley claimed that Defendant Williams arranged for the rerouting of victims' mail to different addresses "as part of their M.O. for stealing personal information and opening new accounts." (Id.) Also during the interview,

Sergeant Nathan states that Defendant Scott-Kelley informed him that Defendant Williams lived in a second floor apartment unit in Brooklyn Center and she provided directions to the apartment.

Postal Inspector Sabby located the address for Ms. Williams on 69th Avenue North and advised Sergeant Nathan that Defendant Williams had placed a hold on her mail from October 6 through October 11, 2008, which included the following direction, "Please hold all mail addressed to Apt 205 regardless of name. Thank you." (Id.) Sergeant Nathan attests that Inspector Sabby checked with the Postmaster and learned that mail held for Defendant Williams' Brooklyn Center address was sent to seven different people, and the senders included Kohl's, Discover, Sears, Capitol One and JC Penney. (Id.) Sergeant Nathan concludes the affidavit, stating, "I believe through my training and experience that Monica Williams is using this address to receive credit cards, financial information and stolen merchandise from victims of identity theft." (Id.)

The search warrant, signed by Hennepin County District Court Judge Patricia Belois on October 9, 2008, authorized the search of the Brooklyn Center apartment for the following:

> (1) computer hardware consisting of all equipment which can collect, create, display, convert and store data; hardware including, but not limited to, any data-processing devices (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, digital cameras; optical storage devices; transistor-like binary devices, and other memory-storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors and optical readers), as well as any devices, mechanisms or parts that can be used to restrict access to computer hardware (such as physical keys and locks);

> (2) computer software used for the printing of checks;

> (3) shipping receipts; bank statements; receipts indicating purchases made by

credit card or check;

(4) cellular telephones;

(5) papers or other documents containing the names or other information about persons not residing at this address; papers or other documents containing the names or account numbers of persons or businesses; mail with names of persons not residing at this address

(6); paper and items showing constructive possession of the residence being searched; and

(7) safety deposit keys, records and other documents tending to show off-site storage facilities and/or locations.

(Brooklyn Center Apartment Search Warrant at 2-1, Govt. Ex. 6.)  As with the Queen Avenue search warrant, the Brooklyn Center warrant requested permission "to have any computer(s) recovered during the search to be brought to a qualified computer forensic analyst to recover any evidence stored within the computer(s) germane to [the] current investigation."  (Id.)

The warrant was signed by Judge Belois on October 9, 2008 and the search was executed that same day. (See "Date Recovered" entry on Return for Brooklyn Center Search Warrant, Govt. Ex. 6.)  Among the items seized bearing the name of another person were the following: letters, credit cards, magazines, checkbooks, checks, booklets, packing lists, a birth certificate, a library card, receipts, credit card statements, an auto loan payment book, a health insurance card, JC Penney order summaries and miscellaneous papers bearing the names of other persons.  (Id.) Also seized were handwritten notes, a Guaranty Bank checkbook in Defendant Williams' name, five bank letters to Defendant Williams, a two-sided page of residents' names; four pages of Mapquest printouts and handwritten notes; Wells Fargo account information for Defendant Williams; a Sunnyside Healthcare timecard; two Visa checkcards in Defendant Williams' name; a book of Wells Fargo checks bearing no name; a cell phone; a digital camera; a billfold

13

containing multiple cards and papers; five Minnesota identification cards; a UPS business card; a Herberger's receipt; a TCF Bank check book; account information regarding a Guaranty Bank account; and a Coach purse containing miscellaneous papers. (Id.)

### D. Maryland Avenue & Baker Street Search Warrants (Govt. Exs. 3 & 4)

The affidavits supporting the search warrant applications for the searches of the Maryland Avenue and Baker Street residences are virtually identical, with any differences noted herein. In both instances, Investigator Urban served as the affiant. She attests that on July 21, 2008, the Ramsey County Sheriff's Department received a report of identity theft involving a victim named Sarah Williams.[2] (See Maryland Avenue & Baker Street Search Warrant Affs. at 1-2, Govt. Exs. 3 & 4.) Sarah Williams, a Shoreview, Minnesota resident, reported that someone using her name had changed her home address and her business address to three different addresses: Queen Avenue North and 29xx Fourth Street North in Minneapolis, and Baker Street in St. Paul. Sarah Williams had also noted fraudulent activity in several of her personal and business accounts. Upon contacting her bank, she learned that several thousand dollars had been charged and that unauthorized accounts had been opened. (Id.)

Investigator Urban states that an investigation revealed that two former employees whom Sarah Williams had terminated were involved in the fraudulent activity. Investigator Urban attests that the former employees, Defendants Scott-Kelley and Williams, were employed by

---

[2] The affidavits for these two search warrants spell Ms. Williams' first name as "Sara," however, for the sake of consistency, the Court adopts the spelling in the previously-discussed search warrant affidavits of "Sarah," as all the warrant applications clearly refer to the same reported victim. Similarly, these two affidavits misspell the last name of Defendant Scott-Kelley as "Scott-Kelly." The Court adopts the spelling of Ms. Scott-Kelley's name as used in the Indictment.

Sarah Williams' business, the Oak Grove Care Center, a facility that provides for the care of vulnerable and handicapped adults.  Investigator Urban reports that both Scott-Kelley and Williams were seen making copies of employee and client records, which included personal information such as banking details, social security numbers and next-of-kin information.  (Id.) Investigator Urban attests, "Suspect Scott-Kelley has been identified at several local banks, cashing checks and depositing money into suspect [Sarah] Williams' account.  The checks that Scott-Kelley has been depositing and cashing, have been fraudulently made, using account numbers from clients and vulnerable adults at the care center, which victim [Sarah] Williams owns."  (Id.)

Further, Investigator Urban notes that she coordinated her investigation with Inspector Sabby of the Postal Service and Charles Nathan of the Minnesota Financial Crimes Task Force. (Id.)  Investigator Urban attests that their investigation revealed that several of the vulnerable adults in Defendant Scott-Kelley's care have had their accounts jeopardized.  Specifically, Investigator Urban claims that Scott-Kelley had used a particular victim to cash checks which Scott-Kelley had fraudulently counterfeited, using other account numbers.  Investigator Urban states that Defendant Scott-Kelley uses the Baker Street address as a mailing address for the names of several vulnerable adults and that Sergeant Nathan's CI has informed him that Defendant Scott-Kelley is stealing clients' personal information, using it to open bank and charge accounts.  (Id.)

Investigator Urban also states that she and Inspector Sabby went to the 29xx Fourth Street North address in Minneapolis, the change-of-address location of victim Sarah Williams' home and business.  (Id.)  The officers found a home in need of repair that appeared to be empty,

however on the outside porch was a sign stating, "Sarah Williams Oak Grove Care Center."

During their visit to this address, the officers spoke to the local mail carrier, and Investigator

Urban attests, "The mail carrier informed us that a black female claiming to be Sarah Williams

had instructed him to deliver mail to the address across the street, until her house was repaired.

It should be noted, the real Sarah Williams is white." (Id.) Investigator Urban states that a photo

line-up was shown to the mail carrier, who pointed out Defendant Scott-Kelley as the person

who identified herself as Sarah Williams and instructed him to deliver mail to an address across

the street. (Id.) That address, according to the affidavit, belongs to the aunt of Defendant Scott-

Kelley. Investigator Urban also states that several area banks had provided her with

surveillance photos of Defendant Scott-Kelley cashing checks which had been reported for

fraudulent activity.

As noted, the Baker Street and Maryland Avenue warrant applications are nearly

identical, although the Maryland Avenue warrant application contains information that a review

of several accounts involving suspected fraudulent activity traced Fed Ex shipments to the

Maryland Avenue address. (Maryland Avenue Search Warrant Aff. at 1-2, Govt. Ex. 3.)

Investigator Urban reports that this is the home of two of Defendant Scott-Kelley's associates

who sell the contents of the Fed Ex shipments, identified as clothing in the warrant application,

on the street at a lower price. (Id.)

Both the Maryland Avenue and Baker Street search warrants were signed by a Ramsey

County District Court Judge on September 30, 2008.[3] The search warrants authorized the search

---

[3] This Court is unable to decipher the specific judge's name, either on the signature
block of the warrant, or in reference to the judge's name on the warrant inventories of the Baker
Street and Maryland Avenue search warrants, but the signature and reference are identical on

of the following items:

> (1) HP Slimline computer model 9578665, serial # S3521P; Compaq 15.1 notebook computer # 430180, serial # C771IUS; computer systems including, but not limited to the main computer box, monitors, scanners, printers, modems and other peripheral devices; media in whatever form, including, but not limited to magnetic (such as floppy disks, hard drives, and magnetic tape); flash (such as media cards and USB thumb drives) or optical (such as compact disks and digital video disks)

> (2) Electronic devices, including but not limited to MP3 players (including, but not limited to iPods), X-box gaming systems, cellular phones and PADS)

> (3) Papers, receipts and effects that tend to show fraudulent activity

> (4) Proof of residency and related documents to show constructive possession of property

> (5) Vehicles owned and or used by suspects, [including two particular license plate numbers]

> (6) Any and all Fed-Ex receipts, shipping receipts, bank statements, papers or other documents containing names or accounts of persons or businesses not residing at this address;

> (7) Safety deposit keys and other documents tending to show off-site storage facilities and/or locations.

> (8) Checking and or savings accounts bearing the names of victims S.W., S.L., P.T., M.M., T.N., and R.S.

> (9) Accounts bearing the name of either Oak Grove Care Center or Mosaic Apartments

(Maryland Avenue and Baker Street Search Warrants at 2-1, Govt. Exs. 3 & 4.) The Maryland Avenue search warrant further authorized the search for "merchandise sent to this address via mail, using fraudulent accounts." (Maryland Avenue Search Warrant at 201, Govt. Ex. 3.)

Both warrants were executed on October 8, 2008. Items seized pursuant to the search of

---

both search warrants.

the Maryland Avenue residence included: "misc. paperwork/mail; Comp book; 1 floral box; 3 I.D.s and masks; 3 pkg diapers; misc. papers/ UPS deliver slips." (Maryland Avenue Search Warrant Return at 3-1, Govt. Ex. 3.) The search of the Baker Street residence yielded the following seized items: "laptop, HP # ND831272J; misc. papers/receipts (in pillowcase, left); cell phones, T-Mobile & Blackberry; misc. papers downstairs." (Baker Avenue Search Warrant Inventory at 3-1, Govt. Ex. 4.)

## II. DISCUSSION

### A. Defendants' Motions to Suppress Evidence Obtained as a Result of Search and Seizures

Defendants move to suppress evidence obtained as a result of searches and seizures. Defendants specifically move to suppress the searches of their respective residences, i.e., Defendants Scott-Kelley and Shaka, a married couple, each move to suppress evidence obtained pursuant to the search of their home on Queen Avenue (see Def. Scott-Kelley's Mem. Supp. Mot. Suppress at 1, Doc. No. 97; Def. Shaka's Mem. Supp. Mot. Suppress at 1, Doc. No. 99), and Defendant Williams moves to suppress evidence obtained pursuant to the search of her Brooklyn Center apartment. (See Def. Williams' Mem. Supp. Mot. Suppress at 1, Doc. No. 100.) In addition, Defendants Scott-Kelley and Shaka, who submitted virtually identical memoranda in support of their respective motions to suppress, seek to broadly exclude "all evidence obtained as a result of any illegal searches or seizures." (Def. Scott-Kelly's Mem. Supp. Mot. Suppress at 1, Doc. No. 97; Def. Shaka's Mem. Supp. Mot. Suppress at 1, Doc. No. 99.)

#### 1. Standing

A defendant has standing to challenge the admission of illegally obtained evidence only if the defendant's own constitutional rights have been violated. See Rakas v. Illinois, 439 U.S.

128, 134 (1978). The Supreme Court has held that a person's Fourth Amendment rights are not infringed if that person "is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property." Id. at 134. In Fourth Amendment challenges, whether a defendant has standing depends on whether he had a subjective and reasonable expectation of privacy in the area searched or the items seized. See Minnesota v. Carter, 525 U.S. 83, 91 (1998). The person challenging the search bears the burden of establishing a subjective expectation of privacy and that the expectation is objectively reasonable. See Minnesota v. Olson, 495 US. 91, 96-97 (1990).

Here, Defendants Scott-Kelley and Shaka have a subjective and reasonable expectation of privacy in their Queen Avenue home, as does Defendant Williams in her Brooklyn Center apartment, which the Government does not appear to contest. To the extent that Defendants Scott-Kelley and Shaka invoke the Fourth Amendment to suppress evidence obtained from the searches of the other locations, however, they have not met the burden of establishing a subjective expectation of privacy, much less that such an expectation is objectively reasonable. They have identified  no evidence to support a privacy interest in Defendant Williams' apartment in Brooklyn Center or in the Maryland Avenue and Baker Street residences in St. Paul. While it is not the Court's responsibility to sift through the record to find evidence supporting Defendants' asserted privacy interests, the Court has nevertheless found limited evidence on this subject and none of it meets the standard required to support a Fourth Amendment expectation of privacy. Defendant Williams' transcribed interview refers to a house in St. Paul owned by Defendant Scott-Kelley, in which persons other than Scott-Kelley live, but Williams does not provide an address. (See Def. Williams' Interview, Govt. Ex. 2A at 27.)   The affidavit for the

Maryland Avenue search warrant provides that the Maryland Avenue address is the home of two of Scott-Kelley's associates, although it contains no information regarding the owner of the property. (Maryland Avenue Search Warrant Aff. at 1-2, Govt. Ex. 3.) In addition, the Queen Avenue search warrant affidavit reports that, according to the CI, Defendant Scott-Kelley owns a property in St. Paul, although the CI did not know the address. (Queen Avenue Search Warrant Aff. at 1-3, Govt. Ex. 5.) This information fails to establish sufficient facts necessary to invoke a Fourth Amendment privacy interest. Moreover, while Defendants Scott-Kelley and Shaka expansively move to suppress all evidence, their memoranda focus exclusively on the searches of their Queen Avenue home. In sum, Defendants Scott-Kelley and Shaka have not demonstrated an expectation of privacy in the Brooklyn Center apartment and the Maryland Avenue and Baker Street residences and therefore have no standing under the Fourth Amendment to challenge the admissibility of the evidence seized at those locations.

The Court therefore turns to the inquiry of whether the "four corners" of the warrant affidavits supplied a substantial basis for concluding evidence of wrongdoing would be found in the Queen Avenue residence and the Brooklyn Center apartment.

### 2.      Probable Cause

"It is well-established that courts may *not* look to facts outside the affidavit in determining the existence of probable cause," United States v. Martin, 833 F.2d 752, 757 (8th Cir. 1987) (Lay, C.J., concurring), cert. denied, 494 U.S. 1070 (1990); rather, "'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" United States v. Etheridge, 165 F.3d 655, 656 (8th Cir. 1999).

"Whether probable cause exists depends upon the totality of the circumstances, <u>Illinois v. Gates</u>, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L.Ed.2d 527 (1983), but it requires a showing of facts 'sufficient to create a fair probability that evidence of a crime will be found in the place to be searched.'" <u>United States v. Wells</u>, 223 F.3d 835, 838 (8th Cir.2000) (citations and quotations omitted); <u>see also</u> <u>United States v. Gabrio</u>, 295 F.3d 880, 883 (8th Cir. 2002)). "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." <u>Zurcher v. Stanford Daily</u>, 436 U.S. 547, 556 (1978). Importantly, "[f]inely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision" whether a showing of probable cause has been met. <u>Gates</u>, 462 U.S. at 235. Rather, "'in dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" <u>Id.</u> at 231 (citations omitted).

In evaluating probable cause, there must be evidence of a nexus between the contraband and the place to be searched before the warrant may be issued. <u>See</u> <u>United States v. Summage</u>, 481 F.3d 1075, 1078 (8th Cir. 2007), <u>cert.</u> <u>denied</u>, 552 U.S. 1104 (2008). In addition, to satisfy the particularity requirement of the Fourth Amendment, "the warrant must be sufficiently definite to enable the searching officers to identify the property authorized to be seized." <u>Id.</u> at 1079 (citing <u>United States v. Horn</u>, 187 F.3d 781, 788 (8th Cir. 1999)). The particularity requirement is a standard of "practical accuracy rather than a hypertechnical one." <u>Id.</u> (citing <u>United States v. Peters</u>, 92 F.3d 768, 769-70 (8th Cir. 1996)). Nevertheless, a warrant that fails

to meet the particularity requirement is invalid.  Groh v. Ramirez, 540 U.S. 551, 557 (2004).

Evidence seized solely due to reliance on invalid portions of a warrant must be suppressed.

United States v. Fitzgerald, 724 F.2d 633, 637 (8th Cir. 1983), cert. denied, 466 U.S. 950 (1984).

"However, where the warrant is invalid only in part, the warrant is 'severable,' and items seized

pursuant to valid portions of the warrant need not be suppressed."  United States v. Timley, 443

F.3d 615, 622 (8th Cir. 2006), cert. denied, 549 U.S. 889 (2006) (citing Fitzgerald, 724 F.2d at

637).

"[T]he preference for warrants is most appropriately effectuated by according 'great

deference' to a magistrate's determination" as to the existence of probable cause.  United States

v. Leon, 468 U.S. 897, 914 (1984); accord Gates, 462 U.S. at 236-37.  In this regard, this Court

does not make a de novo review of the sufficiency of the affidavit.  Gates, 462 U.S. at 236;

accord United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986) ("[A] district court should not

make a de novo determination of probable cause . . . .").  Rather, "the decision to issue the

warrant is to be upheld if supported by substantial evidence in the record," Reivich, 793 F.2d at

959, or, in other words, "so long as the [issuing Judge] had a 'substantial basis for . . .

conclud[ing]' that a search would uncover evidence of wrongdoing."  Gates, 462 U.S. at 236.

Moreover, a court "may properly rely on normal inferences drawn by the surrounding

circumstances and the allegations of facts contained in the affidavit."  United States v. Carlson,

697 F.2d 231, 238 (8th Cir. 1983).

### a.     Queen Avenue Search

Defendants Scott-Kelley and Shaka move to suppress evidence seized pursuant to the

search of their Queen Avenue residence, arguing that the warrant affidavit was insufficient to

establish probable cause that the items sought would be found at their home, that the warrant did not describe data sought from the computers with sufficient particularity to allow a general search and that some of the items seized were not covered by the search warrant. Defendants therefore seek to suppress all evidence seized pursuant to the search, or alternatively, to suppress items not included on the list of items to be seized. The items in question include subsequent forensic computer searches, jewelry, a gold bar, a shotgun and shells, tools and shoes.

As noted, where a warrant is invalid only in part, it is severable and items seized pursuant to the valid portions of the warrant need not be suppressed. Timley, 443 F.3d at 622 (despite warrant's overly broad inclusion of "indicia of occupancy," evidence of drug trade which formed basis for charges was properly admitted because covered by portion of warrant that was sufficiently particular and not overly broad). Here, for most of the categories of items to be seized, the Queen Avenue warrant was valid. The warrant was based on probable cause to believe that Defendants Scott-Kelley and Shaka were involved in an identity theft conspiracy and the seizure of items related to such fraudulent activity was appropriate. (See Queen Avenue Aff. at 1-2, Govt. Ex. 5.) In the affidavit, Sergeant Nathan describes the investigation by the Postal Service, the Minneapolis Police Department, the Minnesota Financial Crimes Task Force and the Ramsey County Sheriff's Department into allegations of identity theft and fraud involving Defendants Scott-Kelley and Shaka. Specifically, the affidavit contains detailed information from a CI that both Scott-Kelley and Shaka resided at the Queen Avenue address and were involved in an identity theft operation in which the victims were residents of the Oak Grove Care Center, a facility for elderly and vulnerable adults at which Defendant Scott-Kelley formerly worked. (Id.) The CI indicated that Defendant Shaka had purchased a vehicle with

stolen money and had made comments about buying a new home with the fruits of the alleged fraudulent activity. (Id. at 1-2; 1-3.) The CI also described the procedure by which Defendants used other addresses to receive merchandise obtained by fraudulent activity.

In addition to the CI's allegations, Sergeant Nathan independently verified that Defendant Shaka was listed on tax records as the owner of the Queen Avenue property and that a van parked in front of the property was registered to Defendant Scott-Kelley. (Id. at 1-2.) Sergeant Nathan also reviewed multiple police reports that corroborated the CI's information. These reports detailed similar patterns of identity theft in which either residents of the Oak Grove Care Center, its owner, or the facility itself were victimized by the theft or unauthorized use of checks, personal information and credit cards. (Id.) Sergeant Nathan discovered that Defendant Scott-Kelley was identified as a suspect on at least six such reports made to the Minneapolis Police Department. (Id.) Through his contact with Postal Inspector Sabby, Sergeant Nathan also learned that in several instances, victims' mail was rerouted to alternate addresses, particularly to a common address on 29xx Fourth Street North in Minneapolis.

Investigator Urban informed Sergeant Nathan about a St. Paul police report in which a vulnerable adult attempted to cash a check for over $ 5,000 reported as stolen from the Oak Grove Care Center. (Id. at 1-3.) When police officers questioned the vulnerable adult, she stated that Defendant Scott-Kelley had brought her to the bank and offered to buy her a car with the money. Investigator Urban further advised Sergeant Nathan that Sarah Williams, the owner of the Oak Grove Care Center, reported that someone claiming to be her had ordered an HP Slimline computer and a Compaq notebook computer from Office Depot. The items were charged on the Oak Grove Care Center's credit card without Sarah Williams' consent and were

delivered to 29xx Fourth Street North. (Id.) The CI also contacted Sergeant Nathan again, informing him that Defendant Scott-Kelley continued to reside at the Queen Avenue North address. (Id.)

Given the foregoing, the Court finds that all of the information viewed in totality, considering "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act," Gates, 462 U.S. at 231, formed a substantial basis for concluding that there was probable cause (a fair probability) to believe that a search of the Queen Avenue residence would uncover evidence of the involvement of Defendants Scott-Kelley and Shaka in the described criminal activity. The affidavit contained facts relevant to establishing a nexus between these two Defendants, the allegations of identity theft and fraud, and the items to be seized, including the two particular models of computers, along with various other types of computer hardware and software, electronic media, receipts and documents containing account information about persons not residing at the residence. Sergeant Nathan reviewed numerous police reports involving a common suspect, Defendant Scott-Kelley, and a common modus operandi involving work-related theft. While the affidavit primarily discusses deliveries to the 29xx Fourth Street address, the CI reported that Scott-Kelley and Shaka lived at the Queen Avenue address and Sergeant Nathan independently confirmed that Defendants Scott-Kelley and Shaka resided at that address. "Few places are more convenient than one's residence for use in planning criminal activity and concealing fruits of a crime." United States v. Hailed, 22 F.3d 779, 780 (8th Cir. 1994), cert. denied, 513 U.S. 882 (1994) (citing United States v. Green, 634 F.2d 222, 226 (5th Cir. 1981)). For all of these reasons, the Court concludes that the Queen Avenue warrant was valid. Any exceptions to this conclusion are noted below.

###### i. Seizure of Computers and Related Electronic Information

Defendants Scott-Kelley and Shaka specifically argue that the search warrant was not sufficiently particular with respect to the scope of the search of the computers. They also argue that the resulting inventory fails to account for any data that was examined, or "mined," by an off-site forensic specialist.

While a search warrant must state with sufficient particularity the items to be seized, the requisite degree of specificity depends on the circumstances and the types of property to be seized. Horn, 187 F.3d at 788. For instance, in a scheme to defraud, a search warrant is deemed sufficiently particular in describing the items to be seized "'if it is as specific as the circumstances and nature of activity under investigation permit.'" Id. (citing United States v. Kail, 804 F.2d 441, 445 (8th Cir. 1986)).

With respect to searches of electronic media, the Eighth Circuit has observed that, "as a practical matter, it is frequently difficult, and often times more intrusive to an individual's privacy, to perform an on-site review of certain items." Summage, 481 F.3d at 1079 (citing United States v. Hill, 459 F.3d 966, 974-75 (9th Cir. 2006)). Off-site analyses are therefore often necessary. Id. The Queen Avenue search warrant provides, in detail, for the search of a variety of computers and computer-related data and further provides for permission for an off-site computer forensic analysis to recover any evidence germane to the investigation that was stored within the computers. As in Summage, in which the investigators had no precise way of knowing the nature of the format in which certain video and photographs were stored or created, and "it was necessary to search a broad array of items for the relevant materials," 481 F.3d at 1079-80, here, the Government could not have fully anticipated where and how stored electronic

information might be found.  See also United States v. Gotha, No. CR07-2006-MB, 2007 WL

2471969 at *11 (N.D. Iowa Aug. 28, 2007) (holding that language in search warrants authorizing

seizure of numerous computer-related items was sufficiently specific, because the police did not

know the particulars of the defendant's computer, and had to necessarily search a broad array of

items for evidence of drug trafficking).

Defendants Scott-Kelley and Shaka cite to United States v. Henderson, 416 F.3d 686, 695

(8th Cir. 2005), cert. denied, 546 U.S. 1175 (2006), a case involving alleged Social Security

disability fraud in which this Court ruled that a search warrant was overly broad in seeking,

among other things, "records which appear on any and all computers which are located in the

house, to include the hard drive and any disks which are located in the house."  However, this

Court concluded that the good-faith doctrine applied and the computer-related evidence was not

suppressed.  Id.  The Eighth Circuit affirmed, noting that "in the context of the rest of the

warrant, the officer had a reasonable belief that [the] warrant was limited to the seizure of

computer files and drives related to Henderson's business activities, finances and disability."

The search warrant language applicable to computers in this case is significantly more detailed

than that in Henderson, and specifies a number of computers and related electronic media to be

seized.  Moreover, as to the nature of activity under investigation, the benefits-related fraud at

issue in Henderson would seem less likely to yield computer-related evidence in the suspect's

home (and therefore one would expect greater specificity in the warrant) than the alleged identity

theft and fraud scheme investigated here, which included information about check counterfeiting

and fraudulent online ordering of merchandise (which could reasonably be expected to be found

on computers and related electronic equipment).   Moreover, the affiant, Sergeant Nathan, sought

and received permission for a forensic computer analysis of any computers recovered, limited to evidence germane to the current investigation. (Queen Avenue Search Warrant at 2-1, Govt. Ex. 5.) Thus, as the Eighth Circuit observed in Henderson, within the context of the warrant, the officers and forensic analysts examining the seized computer data here would have a reasonable belief that the warrant was limited to the seizure of electronic data related to identity theft.

Again, the necessary degree of particularity of the warrant's list of items to be seized depends on the circumstances and the types of items to be seized. Horn, 187 F.3d at 788. In United States v. Sherman, 372 Fed. Appx. 668, 676 (8th Cir. 2010), the Eighth Circuit upheld the seizure of all computer components and data in a search warrant authorizing the seizure of electronic evidence similar to the scope of the Queen Avenue search warrant.[4] In response to the defendant Sherman's argument that the warrant should have been limited to one particular software program called the Tracker Program, the court found that the defendant's argument "failed to acknowledge that he had access to all components of the computer system used in his

---

[4] The search warrant in Sherman allowed for the seizure of the following computer-related items:

> Any and all electronic data processing and storage devices, computer and computer systems including central processing unit, internal peripheral storage devices such as fixed disks, external hard disks, floppy disks and diskettes, tape drives and tapes, optical storage devices, or other memory storage devices, peripheral input/output devices related communication devices such as modem; system documentation, operating logs, handwritten notes in the computer area that could be a password, instruction booklet or other operational manuals for the computer system, and documentation to show any computer assigned or used by Budget Towing and it's [sic] employees, and to take photographs of the area surrounding the computer.

372 Fed.Appx. at 671-672.

business and that the computer data could be manipulated, stored in different formats, or stored outside of the Tracker Program." Id.   Rather, the court concluded that the "search warrant necessarily needed to include all computer equipment and systems to effectively allow law enforcement to 'recognize and seize the materials described.'" Id. (citing Horn, 187 F.3d at 788.)  The court held that the warrant's failure to anticipate the precise form in which the data would appear was not fatal.  Id.  (citing United States v. Lowe, 50 F.3d 604, 607 (8th Cir. 1995)).   The same is true here, as the officers executing the search warrant could not predict the form in which relevant data would appear.   The warrant sought a variety of computer-related evidence directly related to the identify theft investigation.  The affidavit sets forth facts related to such evidence, as it refers to suspected check counterfeiting and online fraudulent activity – activity which would involve the use of items such as computers, printers or related electronic equipment.  While Defendants Scott-Kelley and Shaka further argue that the warrant's inventory fails to specify any data retrieved off-site, the inventory accounts for the seizure of the computers themselves, which includes the computers' contents.

Finally, as to all of the items for which the Court has concluded the affidavit provided probable cause, even if the affidavit was insufficient to establish probable cause, the Leon good-faith exception applies in these circumstances to authorize admission of the evidence. Under the Leon good-faith exception, disputed evidence will be admitted if it was objectively reasonable for the officer executing a search warrant to have relied in good faith on the judge's determination that there was probable cause to issue the warrant.  United States v. Leon, 468 U.S. at 897, 922 (1984).  In assessing whether the officer relied in good faith on the validity of a warrant, we consider the totality of the circumstances and we confine our inquiry "to the

objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization." Leon, 468 U.S. at 922 n. 23. There is absolutely no indication that the issuing judge abandoned her judicial role, that Sergeant Nathan knew of the falsity or was reckless with regard to the truth of anything in his affidavit, that the warrant was facially deficient, or that the warrant was so lacking in probable cause as to render official belief in it unreasonable. See id, 468 U.S. 897, 923 (1984) (explaining when the good faith exception does not apply); see also United States v. Gibson, 928 F.2d 250, 253-54 (8th Cir. 1991) (finding that the Leon good faith exception applied on a showing of probable cause much less than that exhibited here).

### ii.        Seizure of Gun and Ammunition

Defendants Scott-Kelley and Shaka argue in the alternative that even if the court determines that the search warrant affidavit establishes probable cause to search for certain specific items, other items were not covered by it, were improperly seized and should therefore be suppressed. Among the items not listed in the search warrant, but seized during the execution of the warrant, were a shotgun and shotgun shells, which Defendants Scott-Kelley and Shaka move to suppress.

Because the warrant permitting the search of the Queen Avenue home did not specify firearms and ammunition among the items to be seized, the proper seizure of the gun and shells must satisfy an exception to the warrant requirement. Under the plain view doctrine, seizure of evidence without a warrant is permissible if officers are lawfully in a position to view the evidence, the discovery of the evidence is inadvertent, and the incriminating nature of the evidence is immediately apparent. United States v. Strand, 761 F.2d 449, 454 (8th Cir.1985);

United States v. Robinson, 756 F.2d 56, 60 (8th Cir.1985).  In this case, the primary issue is whether the incriminating nature of the shotgun and shells was immediately apparent, because the officers were otherwise lawfully in a position to view the evidence, as they were executing the search warrant.

The incriminating nature of the evidence is considered immediately apparent if there is "'probable cause to associate the property [seized] with criminal activity.'" United States v. Newton, 788 F.2d 1392, 1395 (8th Cir. 1986) (quoting Texas v. Brown, 460 U.S. 730, 741-42 (1983)).  Therefore, it is not required that the officer know or be certain that items are evidence of a crime, but only that the officer have probable cause to associate the property with criminal activity.  United States v. Garner, 907 F.2d 60, 62 (8th Cir. 1990), cert. denied, 498 U.S. 1068 (1991).  In determining whether this requirement is met, courts may consider the collective knowledge of the officers executing the searches.  United States v. Armstrong, 554 F.3d 1159, 1163 (8th Cir. 2009), cert. denied, 129 S. Ct. 2805 (2009).

Here, while the search warrant did not include guns and ammunition among the items to be seized, the warrant application sought unannounced entry due to the anticipated presence of guns in the residence.  (See Queen Avenue Search Warrant Aff. 1-4, Govt. Ex. 5.)  The CI had informed Sergeant Nathan that both Defendant Scott-Kelley and Defendant Shaka possessed guns.  The CI also informed Sergeant Nathan that Defendant Shaka had served prison time for guns, which Sergeant Nathan independently verified, finding that Shaka had been convicted and sentenced to prison for weapons violations.  (Id.)  Sergeant Nathan, who possessed this information, executed the Queen Avenue search warrant.  (See Brooklyn Center Search Warrant Aff. at 1-2, Govt. Ex. 6) (stating that on "October 8, 2008, I conducted a search warrant at xxix

Queen Avenue North.") The evidence from Defendant Shaka's criminal records review indicating that he had previously served prison time for weapons violations was sufficient to provide probable cause to believe that the firearm constituted evidence of a § 922(b) "felon in possession" offense. See United States v. Wells, 98 F.3d 808, 810 (4th Cir. 1996). Accordingly, the Court concludes that the shotgun and shells were properly seized pursuant to the plain view exception and Defendants' motions to suppress this evidence should be denied.

### iii. Seizure of Jewelry, Tools and Shoes

Defendants Scott-Kelley and Shaka also move to suppress several other specific items, arguing that they were not included in the list of items to be seized and that no exception to the Fourth Amendment applies justifying their seizure. The items in question include a gold bar, gold and diamond bracelet, Movado watch, numerous mechanical tools and shoes. (See Def. Shaka's Supp'l Mem. in Supp. Mot. Suppress at 6, Doc. No. 99; Def. Scott-Kelley's Supp'l Mem. in Supp. Mot. Suppress at 4, Doc. No. 97.)

The search warrant inventory reflects that a sales receipt accompanied certain of these items. (See Queen Avenue Return, Govt. Ex. 5.) Specifically, the items accompanied by a receipt include a Clark cut-out saw, Movado watch, Craftsman 106-piece mechanics tool set found in the garage and a Poulan chainsaw. (Id.) The other items for which no receipt was attached, excluding the gun and ammunition discussed above, include another Craftsman 106-piece mechanics tool set, a gold bar, a gold and diamond bracelet, a night vision scope, a Craftsman three-drawer tool box, a Superior power tool set and five pairs of shoes. None of these items are found on the list of items to be seized, with the exception of the receipts which accompany certain items, as "receipts indicating purchases made by credit card or check," UPS

receipts, FedEx receipts and shipping receipts are included in the list of items to be seized.  (See Queen Avenue Search Warrant at 2-1, Govt. Ex. 5.)  With respect to the items accompanied by receipts, i.e., the Clark cut-out saw, Movado watch, Craftsman 106-piece mechanics tool set found in the garage and Poulan chainsaw, the warrant affidavit sets forth information regarding the purchase and delivery of merchandise obtained through identity theft, stolen bank accounts and credit cards.  Moreover, the items in question essentially represent the physical form of items referenced in the accompanying receipts, and receipts were included among the items to be seized.  The Court therefore finds that officers executing the search warrant had probable cause to associate these items – the Clark cut-out saw, Movado watch, Craftsman 106-piece mechanics tool set found in the garage and Poulan chainsaw –  with criminal activity and seize them as contraband.   Accordingly, the Court recommends the denial of the motions of Defendants Scott-Kelley and Shaka to suppress these particular items to which receipts were attached.

Regarding the items for which no receipts were attached and which were not included on the list of items to be seized, these items must be suppressed if no exception to the Fourth Amendment's warrant requirement applies.  As noted, the plain view exception permits the seizure of such evidence if officers seizing the evidence are lawfully in a position to view the evidence, the discovery of the evidence is inadvertent, and the incriminating nature of the evidence is immediately apparent.  See Strand, 761 F.2d at 454 (8th Cir.1985); Robinson, 756 F.2d at 60 (8th Cir.1985).  Unlike the items for which a receipt was attached (and for which officers had probable cause to associate the items with criminal activity), the incriminating nature of these items is not immediately apparent.   Accordingly, the Court recommends the suppression of the Craftsman 106-piece mechanics tool set which was not accompanied by a

Sears receipt, the gold bar, gold and diamond bracelet, night vision scope, Craftsman three-drawer tool box, Superior power tool set and five pairs of shoes.

<b>b.</b>   <b>Brooklyn Center Apartment Search</b>

Defendant Williams moves to suppress evidence seized pursuant to the search of her Brooklyn Center apartment, arguing that the search warrant lacked probable cause as it contained conclusory statements and called for the seizure of items well beyond the probable cause that may have existed in the warrant. In addition, Defendant Williams argues that the search warrant affidavit lacks any time frame by which one could conclude that evidence of a crime might be found at her apartment as of October 9, 2008.

As to Defendant Williams' argument that the information in the affidavit is conclusory in nature and therefore cannot establish probable cause, it is true that an affidavit that is "wholly conclusory" cannot establish probable cause. United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (citing Gates, 462 US. at 239). Examples of such affidavits include those in which law enforcement officers simply express their belief that a search will yield evidence of criminal conduct. Id. In Gates, the Supreme Court explained that such affidavits provide the issuing magistrate with no independent basis for making a probable cause determination. 462 U.S. at 239; see also, Summage, 481 F.3d at 1077-78. While noting that the challenged affidavit in Colbert might "not be a model of detailed police work," the Eighth Circuit concluded that it set forth a number of specific facts and explained how the investigation took place. 605 F.3d at 576. While the affiant did not word the affidavit in the first-person, the Court found that his statements supported fair inferences as to the sources information and that the affiant had firsthand knowledge of the investigation. Accordingly, the court found that the affidavit was not

too conclusory to establish probable cause. Similarly, in <u>United States v. Wallace</u>, 550 F.3d 729, 733 (8th Cir. 2008), the Eighth Circuit rejected a defendant's argument that a search warrant affidavit was too conclusory, finding that the source of the affiant's information was sufficiently clear and included statements such as "she said," and "she stated," referencing statements made by a victim. Likewise, in <u>Summage</u>, the Eighth Circuit concluded that the source of information in the search warrant affidavit at issue was determinable from the context of the affidavit.

The Court finds that Sergeant Nathan's affidavit supporting the search of Defendant Williams' apartment contained sufficient probable cause for the issuance of the warrant. The affidavit does not consist of unsupported conclusions and speculation. In the affidavit, Sergeant Nathan described his investigation into allegations of identity theft, fraudulent use of credit cards, check counterfeiting and mail theft in which Defendant Williams was a suspect. (<u>See</u> Brooklyn Center Search Warrant Aff. at 1-2, Govt. Ex. 6.) It is evident that Sergeant Nathan had first-hand knowledge of the investigation involving Williams. Noting his presence during the execution of the Queen Avenue search conducted the previous day, Sergeant Nathan summarized the information related to the issuance of the Queen Avenue warrant, including information that Defendant Williams and Defendant Scott-Kelley were former co-workers at Oak Grove Care Center and that the owner of Oak Grove Care Center had filed numerous reports with the Minneapolis Police Department naming Williams and Scott-Kelley as suspects in theft of property and information from the business owner, the business, and the residents of the facility. (<u>Id.</u>) Sergeant Nathan noted that during the search conducted at Scott-Kelley's home, at which he was present, an HP Slimline computer of the same type that had been reported as fraudulently ordered was recovered. Thus, Sergeant Nathan established a connection in the identity theft

35

investigation between Defendants Scott-Kelley and Williams, based on his personal observations and background in the investigation.

In addition, Sergeant Nathan referred to a statement taken from Defendant Scott-Kelley during the time of the execution of the Queen Avenue search warrant the previous day.  (Id.)  In her statement, Scott-Kelley implicated Defendant Williams, stating that she had received stolen credit card and account information from her former co-worker, Defendant Williams.  Defendant Scott-Kelley also identified herself and Williams in surveillance images taken at ATMs, making deposits and withdrawals with stolen account information.  (Id.)  Defendant Scott-Kelley stated that Williams had re-routed victims' mail as part of the modus operandi for the identity theft operation.  Further, Defendant Scott-Kelley stated that Williams lived in a second floor apartment in Brooklyn Center and provided Sergeant Nathan with directions to the apartment. (Id.)  In the Brooklyn Center search warrant affidavit, all of this information is attributed to Defendant Scott-Kelley.  Were the affidavit truly conclusory, one would expect it to instead state, 'Williams provided stolen credit card and account information to her co-worker, Scott-Kelley.  Williams and Scott-Kelley are seen in ATM surveillance images, making deposits and withdrawals with stolen account information,' and so forth.  Instead, the source of this information -- Scott-Kelley's statement -- is unambiguous.

Sergeant Nathan also reported in the affidavit that on October 8, 2008, Postal Inspector Sabby informed him that Defendant Williams had placed a hold on her mail, effective October 6 through October 11, 2008, requesting that all mail addressed to her apartment be held, regardless of the recipient's name.  (Id.)  Inspector Sabby further investigated the held mail, finding mail bearing Defendant Williams' address, but with the names of seven different recipients.  (Id.)

The entities sending the held mail included companies such as Kohl's, Sears, Capitol One, Discover and JC Penney. Based on this information, Sergeant Nathan stated that his training and experience led him to conclude that Defendant Williams was using her address to receive credit cards, financial information and stolen merchandise from identity theft victims. (Id.).

Again, Sergeant Nathan properly attributed the sources of information in the affidavit, and established a nexus between Defendant Williams and her Brooklyn Center address, on which a mail hold had been placed. Moreover, the mail hold included the specific direction to hold all mail sent to her address, regardless of the name of the recipient. The Court therefore concludes that the affidavit was not impermissibly conclusory, but provided sufficient probable cause to believe that evidence of identity theft-related crime would be found at Defendant Williams' apartment. As noted previously with respect to the Queen Avenue search warrant, "Few places are more convenient than one's residence for use in planning criminal activity and concealing fruits of a crime." Hailed, 22 F.3d at 780.

Turning to Defendant Williams' "staleness" argument, "probable cause to issue a warrant must exist at the time it is issued." United States v. Ozar, 50 F.3d 1440, 1446 (8th Cir. 1995), cert. denied, 516 U.S. 871 (1995). Delay in seeking and obtaining a warrant may lead to its invalidation, however, the lapse of time is not necessarily controlling: "There are other factors to be considered, including the nature of the criminal activity involved, and the kind of property for which authority to search is sought." Id. (citing United States v. Sleeves, 525 F.2d 33, 38 (8th Cir.1975)). In Ozar, involving an investigation into conspiracy to commit bank fraud, the court held, "the passage of time is less significant when there is cause to suspect continuing criminal activity." Id. (citing United States v. Tallyman, 952 F.2d 164, 166 (8th Cir.1991), cert. denied,

504 U.S. 961 (1992); United States v. Jones, 801 F.2d 304, 314 (8th Cir.1986)). While the FBI

was investigating activity that stretched back over four years in Ozar, the court found that recent

surveillance, combined with the continuing nature of the suspected criminal activity, provided a

substantial basis for the finding of probable cause: "'where recent information corroborates

otherwise stale information, probable cause may be found.'" Id. (citing United States v. Macklin,

902 F.2d 1320, 1326 (8th Cir.1990), cert. denied, 498 U.S. 1031 (1991)).

Here, the affidavit established the on-going nature of the suspected identity theft

conspiracy, noting multiple victims and at least seven police reports filed by Defendant

Williams' former employer alone. (See Brooklyn Center Search Warrant Application at 1-2,

Govt. Ex. 6.) While the affidavit does not specify the dates on which this information was

reported, the Court reasonably assumes that the seven police reports filed by Sarah Williams, the

owner of the Oak Grove Care Center, either in her personal or business capacity, were filed over

a period of time. The affidavit also states that Sarah Williams reported an unauthorized change

of address for her business on July 9, 2008. Affiant Sergeant Nathan refers to information

implicating Defendant Williams that he obtained during the execution of the Queen Avenue

search warrant and interview of Defendant Scott-Kelley on October 8, 2008 – one day prior to

the application, issuance and execution of the Brooklyn Center search warrant. Finally, the

affidavit also notes that Defendant Williams requested a mail hold for her address, regardless of

the name of the recipient, for the period of October 6 through October 11, 2008. The Court

concludes that the alleged identity theft conspiracy was of an on-going nature. The very recent

information obtained on October 8, 2008, the day before the Brooklyn Center search warrant

application was submitted to the judge, corroborated older information, to the extent that any

older information could be considered stale. Accordingly, the Court concludes that the fact that the warrant contains evidence dating over time does not invalidate it.

Finally, Defendant Williams argues, that even if the warrant were determined sufficient to support probable cause to search for other persons' mail, the affidavit does not support the search of William's computer and related electronic devices, nor does it support the seizure of "virtually every piece of paper that was in her apartment on the day that the warrant was executed." (Def. Williams' Mem. Supp. Mot. Suppress Ev. at 6, Doc. No. 100.)

As with the affidavit for the Queen Avenue search warrant, the affidavit for the Brooklyn Center search warrant described an investigation into suspected identity theft involving fraudulent credit cards, computer-generated counterfeit checks, mail theft, internet crimes, unauthorized purchase of computers and identity theft crimes. (Brooklyn Center Search Warrant Aff. at 1-2, Govt. Ex. 6.) The affidavit refers to the seizure of a fraudulently purchased computer at Defendant Scott-Kelley's home the previous day and the affidavit provides that Defendant Williams placed a hold on her mail through the "Web Service Center," which implicates Internet usage. (Id.) Given these facts, there was probable cause to search for computers and related electronic information. As to the documentary evidence involving receipts and account information, the underlying basis of the alleged identity theft conspiracy, as described in the affidavit, involved the alleged theft of others' bank account information, personal information and credit card details. The affidavit refers to police reports in which Defendant Williams is suspected of engaging in this activity, it describes the ongoing investigation, in which law enforcement officers discovered the unauthorized purchase of items sent to third-party addresses, and it references Defendant Scott-Kelley's statement, directly

implicating Defendant Williams' involvement in stealing personal information and rerouting mail. The Court concludes that there is ample probable cause justifying the search and seizure of receipts and related documentary information. Defendant Williams' motion to suppress information should therefore be denied.

Moreover, even if the affidavit was insufficient to establish probable cause, the <u>Leon</u> good-faith exception applies in these circumstances to authorize admission of the evidence. There is absolutely no indication that the issuing judge abandoned the judicial role, that Sergeant Nathan knew of the falsity or was reckless with regard to the truth of anything in his affidavit, that the warrant was facially deficient, or that the warrant was so lacking in probable cause as to render official belief in it unreasonable. <u>See id</u>, 468 U.S. 897, 923 (1984) (explaining when the good faith exception does not apply); <u>see also</u> <u>Gibson</u>, 928 F.2d at 253-54 (8th Cir. 1991) (finding that the <u>Leon</u> good faith exception applied).

**B.      Defendant Scott-Kelley's Motion to Suppress Photo Identification (Doc. No. 47)**

Defendant Scott-Kelley moves to suppress all evidence taken in violation of her Fifth Amendment rights, specifically evidence relating to a "photo line-up" referenced in the Maryland Avenue and Baker Street search warrant affidavits. In those affidavits, Investigator Urban indicates that she and Inspector Sabby visited the 29xx Fourth Street address in Minneapolis, which appeared to be deserted. (Maryland Avenue & Baker Street Search Warrant Affs. at 1-2, Govt. Exs. 3 & 4.) While there, they spoke with the local mail carrier, who informed them that a black female claiming to be Sarah Williams had instructed him to deliver her mail to the house across the street while her home was under repair. (<u>Id.</u>) Investigator Urban attests, "A photo line up was shown to the mail carrier. The mail carrier pointed out suspect

Scott-Kelley as the female identifying herself as Sarah Williams and instructing him to deliver Williams' mail to the address across the street."  (Id.)

Before the hearing on Defendants' pretrial motions, counsel for Defendant Scott-Kelley contends that counsel for the Government provided him with copies of one photograph of Scott-Kelley and informed him that the photo had been shown to the postal carrier.  (See Scott-Kelley's Mem. Supp. Mot. Suppress Evidence Obtained in Violation of Fifth Amendment at 1, Doc. No. 98.)  Ms. Lee-Dixon, counsel for the Government, addressed this issue during the hearing and noted that she had provided defense counsel with a copy of "the one photograph that was shown" to the postal carrier.  Counsel for Defendant Scott-Kelley then received permission to file supplemental briefing on this issue in which Defendant Scott-Kelley asserts that a single photo line-up is inherently suggestive, in violation of the Fifth Amendment, and the identification should be suppressed.  In the Government's response to Scott-Kelley's motion, however, the Government accuses defense counsel of mischaracterizing the manner in which the photo was presented to the mail carrier, asserting, "The defendant's photo was one of three photographs shown to the mail carrier."  (Govt's Supp'l Opp'n Mem. at 23, Doc. No. 101.)

The Due Process Clause of the Fifth Amendment prohibits the admission of identification testimony obtained from overly suggestive procedures that could lead to an irreparably mistaken identification.  Stovall v. Denno, 388 U.S. 293, 302 (1967); see also Kirby v. Illinois, 406 U.S. 682, 690-91 (1972) (finding that the right to counsel does not attach to pre-indictment identification, but that admissibility of such procedures is governed by the due process standard). In Neil v. Biggers, the Supreme Court explained that "[i]t is the likelihood of misidentification which violates a defendant's right to due process," placing the focus of inquiry on the reliability

of the identification testimony. 409 U.S. 188, 198 (1972). Therefore, an identification derived from unnecessarily suggestive procedures need not be excluded if, under the totality of the circumstances, the identification is reliable. See Manson v. Brathwaite, 432 U.S. 98, 114-16 (1977).

Courts employ a two-step analysis to determine the admissibility of identification testimony: first, the defendant must prove that the identification procedure was impermissibly suggestive; second, the court considers whether the testimony was nevertheless reliable using the five Biggers factors. Id. at 116. The five Biggers factors include: (1) the witness's opportunity to view the culprit at the time of the crime; (2) the witness's degree of attention at the time of the crime; (3) the accuracy of the witness's description of the culprit prior to the identification; (4) the witness's level of certainty when identifying the defendant at the confrontation; and (5) the length of time between the crime and the confrontation. Biggers, 409 U.S. at 199-200.

The use of a single photograph in the context of a line-up has been deemed unnecessarily suggestive. United States v. Daily, 488 F.3d 796, 804, n.7 (8th Cir. 2007), cert. denied, 552 U.S. 1222 (2008) (noting the court's previous rulings that "showing only a single suspect to the witness is the most suggestive and, therefore, the most objectionable method of pretrial identification."); Ruff v. Wyrick, 709 F.2d 1219, 1220, n. 2 (8th Cir. 1983) (finding that a single photographic display is unnecessarily suggestive); United States v. Johnson, 56 F.3d 947, 954 (8th Cir. 1995) (holding certain photo spreads not impermissibly suggestive for several reasons, including the fact that "witnesses were never shown only a single photograph, which we have held to be impermissibly suggestive.") (citing Ruff, 709 F.2d at 1220)). In Ruff, the Eighth Circuit observed, "The Supreme Court has consistently questioned the use of a single photograph

for pretrial identification and has encouraged the use of a reasonable photographic display." 709 F.2d at 1220 (citing <u>Manson</u>, 432 U.S. at 98; <u>Simmons v. United States</u>, 390 U.S. 377, 383 (1968))

Here, the affidavits for the Maryland Avenue and Baker Street search warrants refer to officers showing the postal carrier a "photo line-up." The Government has presented conflicting information to the Court regarding this line-up, or photo array, as it is perhaps more properly described. At the pretrial motions hearing, the Government represented that <u>one</u> photo was shown to the mail carrier and provided a copy of that photograph to counsel for Defendant Scott-Kelley. In the Government's supplemental briefing, however, the Government claims that defense counsel improperly characterized the "manner in which the photo was presented to the mail carrier," arguing that officers showed the mail carrier not one, but <u>three</u> photographs. (<u>See</u> Govt's Supp'l Opp'n Mem. at 23.) Due to the conflicting information before it, the Court is hindered in its ability to apply the two-part analysis to determine the admissibility of this identification. If, in fact, one photograph was shown, the authority cited above finds a one-photograph "array" identification to be impermissibly suggestive. Assuming that is the case, for the sake of argument, the Court is further hamstrung at the second step of the analysis because it has no information upon which to evaluate the totality of the circumstances, because the Government provided no testimony or other evidence on this subject. Alternatively, if three photographs were shown to the postal carrier, the Court has nothing before it to evaluate whether such an array was impermissibly suggestive at the first step of the analysis. The Government presented no testimony on this subject from the officers who obtained the photo identification, even though Inspector Sabby, who testified at the motions hearing regarding Defendant

Williams' statement, appears to have been present during the photo identification.  Prior to the evidentiary portion of the pretrial motions hearing, counsel for Defendant Scott-Kelley expressed his intent to challenge the photo identification as inherently suggestive.   Yet no testimony was elicited from any witness on the subject by the Government.

In other cases involving the admissibility of a photo identification, courts have had the benefit of evidence that at least identifies the scope of the photo array and/or the manner in which it was presented to the witness.  For instance, in United States v. Johnson, the defendant argued that the photo spreads in his case were improperly suggestive because the witnesses were shown two different photo spreads, but Johnson's photo was the only one included in both arrays.  56 F.3d at 953-54.  The court disagreed, noting that the photo spreads were comprised of men of the same race, with similar features and there was no evidence of any prompting or suggestion from the officers, nor were the witnesses shown only a single photo.  Id.   In Daily, 488 F.3d at 804, there was evidence that the witness had been shown an array of photographs and was shown the same photo array within a two-week period.

Here, there is nothing before the Court to evaluate, as the Government presented no testimony regarding the postal carrier's identification of Defendant Scott-Kelley.  This is information in the Government's possession, not the Defendant's, as the identification was obtained by agents of the Government.  Because of the lack of evidence before the Court, it recommends that Defendant Scott-Kelley's motion to suppress the pretrial photo identification be granted.

This recommendation to suppress evidence is limited to the references regarding the photo identification in the search warrant affidavits for the Maryland Avenue and Baker Street

search warrants, Government Exhibits 3 and 4, and does not extend to possible in-court identifications at trial, assuming that any such in-court identifications independently satisfy the two-part <u>Manson v. Brathwaite</u> test.  <u>See</u> <u>United States v. Tucker</u>, 169 F.3d 1115, 1118 (8th Cir. 1999); <u>Ruff</u>, 709 F.2d at 1220; <u>Johnson v. Wyrick</u>, 653 F.2d 1234, 1237 (8th Cir. 1981), <u>cert. denied</u>, 454 U.S. 1149 (1982).  In <u>Tucker</u>, while the lower court had deemed a pretrial identification procedure unreliable, the Eighth Circuit held that it did not give rise to a substantial likelihood of irreparable misidentification by the same witness at trial. 169 F.3d at 1118  The lower court had suppressed the pretrial identification as unreliable, finding the photo array had been haphazardly assembled and the identification procedure occurred nearly a year after the witness's observations.  Moreover, the witness did not testify at the suppression hearing.  At trial, the court permitted the witness whose pretrial identification had been suppressed to identify the defendant after describing the circumstances and his own observations at the time of the robbery in question.  <u>Id.</u>  Similarly, in <u>Johnson v. Wyrick</u>, the court acknowledged, "if subsequent in-court identifications of appellant are found to have a basis independent of any improper procedure, such identifications are admissible despite potentially suggestive pre-trial identification procedures."  653 F.2d at 1237.  Likewise, in <u>Ruff</u>, the court held that despite an objectionable pretrial identification of the defendant, the in-court identification of the same defendant was reliable, under the totality of the circumstances.  709 F.2d at 1220.

The requested scope of Defendant Scott-Kelley's motion to suppress is unclear. Defendant Scott-Kelley's motion is entitled "Motion to Suppress All Evidence Obtained as a Result of Any Violation of Her Rights as Secured by the Fifth Amendment," and in the opening

sentence of the memorandum in support of her motion, she seeks to suppress "all evidence."
(Scott-Kelley Mem. Supp. Mot. Suppress Evidence Obtained in Violation of Fifth Amendment
at 1, Doc. No. 98.) The short memorandum, however, focuses exclusively on the photo array
and the requested relief seeks the suppression of the photo identification. There is no evidence
that the photo identification in any way impacted the search of the Scott-Kelley Queen Avenue
home, as the photo identification reference is found in the search warrant affidavits for the
Maryland Avenue and Baker Street residences, nor is there any evidence that the photo
identification affected Scott-Kelley's statement. As Defendant Scott-Kelley has neither
specified any other specific violation, much less provided any basis for the suppression of other
unspecified evidence on Fifth Amendment grounds, to the extent that her motion seeks such an
expansive result, it should be denied.

### C.        Defendants' Motions to Suppress Statements (Doc. Nos. 47, 67, 75)

Defendants Williams and Shaka specifically filed motions to suppress any statements or
confessions. Defendant Scott-Kelley filed a generic motion to suppress evidence obtained as a
result of Fifth Amendment violations, which this Court construes as applicable to any
statements.

As noted in the factual background of this case, both Defendants Scott-Kelley and
Williams provided Mirandized statements. (See Interviews of Scott-Kelley & Williams CD,
Govt. Ex. 2.) The Government has represented that there are no other statements at issue.
Accordingly, based on that representation and the testimony presented at the criminal motions
hearing, counsel for Defendant Scott-Kelley orally withdrew the portion of Scott-Kelley's Fifth
Amendment motion insofar as it pertained to the suppression of statements. Counsel for

Defendant Williams did not formally withdraw Williams' Motion to Suppress Statements, but based on the testimony presented by the Government at the pretrial motions hearing, he declined to submit supplemental briefing. Defendant Shaka provided no statements, therefore his motion to suppress is denied as moot.

To the extent that Defendants' Williams motion remains pending, she moves to suppress any statements arguing that any such statements were made without the benefit of counsel in violation of her Fifth and Sixth Amendment rights and that any statements were not given freely and voluntarily, in violation of her Fourth and Fifth Amendment rights.

The Fifth Amendment privilege against self-incrimination protects individuals from being forced to testify against themselves. U.S. Const. amend. V. <u>Miranda</u> warnings must be given before any interrogation of a suspect in custody may take place. <u>Miranda v. Arizona</u>, 384 U.S. 436, 460-61 (1966).

Under <u>Miranda</u>, custody involves the deprivation of "freedom of action in any significant way." 384 U.S. at 444. <u>Miranda</u> warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977). To determine whether a person is in custody, a court assesses the objective circumstances of the situation from the perspective of a reasonable person in the suspect's position. <u>See</u> <u>Berkemer v. McCarty</u>, 468 U.S. 420, 422 (1984). Thus, a suspect is in custody if, under the totality of the circumstances, a reasonable person would not feel free to end the encounter and leave. <u>See</u> <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 663-65 (2004); <u>United States v. New</u>, 491 F.3d 369, 373-74 (8th Cir. 2007) (finding no custody because defendant was interviewed in hospital room, told he did not have to answer questions, and was not under

arrest).  If questioning takes place in surroundings familiar to the accused, courts are less likely

to find that the defendant was in custody.  <u>See</u> <u>Beckwith v. United States</u>, 425 U.S. 341, 345-47

(1976) (<u>Miranda</u> warnings not required because IRS agents conducted cordial interview of

taxpayer at home); <u>see</u> <u>e.g.</u>, <u>United States v. Plumman</u>, 409 F.3d 919, 924 (8th Cir. 2005)

(<u>Miranda</u> warnings not required because interview occurred during daytime in unlocked FBI

vehicle parked in suspect's driveway and suspect was told participation was voluntary).

 As noted, the only statement given by Defendant Williams was the statement made on

October 9, 2008, to Postal Inspector Sabby, Investigator Urban and Sergeant Nathan.  (<u>See</u>

Williams' Statement, Govt. Exs. 2 & 2A.)   Defendant Williams was not in custody at the time

she made the statement, which took place in her apartment.  Inspector Sabby testified that she

was not arrested before the interview and was not arrested immediately after it.  Most

importantly, even though she was not in custody, the officers conducting the interview provided

a <u>Miranda</u> warning at the outset and Ms. Williams waived her rights.

 At no time did Defendant Williams ask to speak to a lawyer or indicate that she no longer

wished to answer questions.   The <u>Miranda</u> right to counsel only attaches when a suspect invokes

the right during custodial interrogation by making a clear and unequivocal request for counsel.

<u>See</u> <u>Davis v. United States</u>, 512 U.S. 452, 458-59b (1994) (holding that defendant's statement,

"maybe I should talk to a lawyer," was ambiguous and did not require officers to clarify).

 Finally, there is no evidence of coercion or promises made to Defendant in order to

extract her statement.  The test for determining the voluntariness of a confession is whether the

confession was extracted by threats, violence, or direct or implied promises, such that

Defendant's "will [was] overborne and his capacity for self-determination critically impaired."

<u>Sumpter v. Nix</u>, 863 F.2d 563, 565 (8th Cir. 1988) (quotation omitted).  There is no evidence that any promises were made to Defendant Williams, nor is there evidence that her will was overborne when he was speaking with the agents.  To the contrary, Inspector Sabby testified that Ms. Williams' demeanor was polite.  The Supreme Court has held that coercive police activity is a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment.  <u>Colorado v. Connelly</u>, 479 U.S. 157, 169-70 (1986).  There is no evidence of such coercive activity here.  For all of these reasons, the Court recommends that Defendant Williams' Motion to Suppress Statements be denied.

Finally, Defendant Williams argues in this motion that her arrest was unlawful and without probable cause.  Similar to the probable cause analysis with respect to search warrants, a district court's determination that probable cause supports an arrest is founded on a consideration of "whether the totality of facts based on reasonably trustworthy information would justify a prudent person in believing the individual arrested had committed or was committing an offense." <u>United States v. Wallraff</u>, 705 F.2d 980, 990 (8th Cir.1983).  Probable cause does not require a prima facie showing of criminal activity, but only the probability of criminal activity. <u>United States v. Henry</u>, 763 F.2d 329, 330-31 (8th Cir. 1985).  For the reasons identified above regarding probable cause supporting the issuance of the search warrant of Ms. Williams' apartment, the Court concludes that the totality of facts based on reasonably trustworthy information would justify a prudent person in believing that Williams had committed or was committing an offense.  The Court therefore recommends the denial of this portion of Defendant Williams' motion.

**D.** **Defendant Scott-Kelley's Motion to Suppress Electronic Surveillance Evidence**

The Government represents that no electronic surveillance was used in its investigation of Defendant Scott-Kelley. Because no applicable evidence of electronic surveillance is at issue, the Court recommends that Defendant Scott-Kelley's Motion to Suppress Electronic Evidence be denied as moot.

**E.** **Defendant Shaka's Motion to Suppress Eyewitness Identifications**

Defendant Shaka moves to suppress any eyewitness identification, particularly in the form of photo line-ups. As there are no such identifications of him, his motion to suppress should be denied as moot.

**IT IS HEREBY RECOMMENDED** that:

1. Defendant Scott-Kelley's Motion to Suppress Evidence Obtained as a Result of Any Illegal Searches or Seizures (Doc. No. 46) be **GRANTED in part** and **DENIED in part**, consistent with this Report & Recommendation;

2. Defendant Scott-Kelley's Motion to Suppress All Evidence Obtained as a Result of Any Violation of Her Rights as Secured by the Fifth Amendment (Doc. No. 47) was **WITHDRAWN BY COUNSEL in part**, as related to the suppression of statements, be **GRANTED in part,** as related to evidence of the pretrial identification procedure; and be **DENIED in part**, as related to any other unspecified Fifth Amendment right;

3. Defendant Scott-Kelley's Motion to Suppress All Electronic Surveillance (Doc. No. 48) be **DENIED AS MOOT**;

4. Defendant Williams' Motion to Suppress Evidence Obtained as a Result of

Search and Seizure (Doc. No. 66) be **DENIED**;

5.        Defendant Williams' Motion to Suppress Statements, Admissions and Answers (Doc. No. 67) be **DENIED**;

6.        Defendant Shaka's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 74) be **GRANTED in part** and **DENIED in part**, consistent with this Report & Recommendation;

7.        Defendant Shaka's Motion to Suppress Statements (Doc. No. 75) be **DENIED AS MOOT;** and

8.        Defendant Shaka's Motion to Suppress Eyewitness Identification (Doc. No. 76) be **DENIED AS MOOT.**

Dated: November 9, 2010

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **December 1, 2010**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.